Good morning everyone. You may be seated. I want to especially welcome the students from Sonoma Academy. I take it that's in Sonoma. Am I right? Well, thank you for coming down. I hope you learned something today. We will take the cases up in the order in which they appear on the docket. We have one case submitted today. It's Vaughn v. Agoda Company. So we will start with Schwake v. Arizona Board of Regents. You may proceed. May it please the Court. Good morning, Your Honors. My name is Aaron Block, B-L-O-C-K, on behalf of Dr. Schwake, and I'd like to reserve three minutes of time for rebuttal, if I may. All right. Watch the clock. Thank you, Your Honor. I'd like to begin by focusing on Title IX and the Title IX aspect of this case. Now, Title IX promotes a couple of very important values, and the first is that universities like Arizona State absolutely have to take allegations of sexual misconduct on campus seriously. They have to investigate those allegations. They have to do a good job, and where they're credible, they need to take serious action. But the other thing that Title IX imposes on schools like ASU is to treat accused students fairly. As much as ASU has to investigate zealously, they also have to investigate fairly. They have to honor traditional norms of fair fact-finding and analysis. They have to allow students who are accused, whose lives and reputations are on the line, the opportunity to defend themselves. And I think it's important to back out a little bit and think about the context. If you are a student on campus, one of the most powerful government officials you will ever encounter in your young life is a school disciplinary official. These are people invested with an enormous power to dictate the direction of your future, your professional future, your social future, your economic future. And so it's important that they care. Now, I believe the parties are in agreement on the overall governing legal standard in a case like this, and that is that schools like ASU are forbidden from discriminating on the basis of sex in the way they investigate campus sexual misconduct allegations. All right, Counsel. So how is your client discriminated against on the basis of sex? Sure, Your Honor. It's a great question, and I'll turn to that. So what the courts of appeals around the country have coalesced around, and I'm speaking of the Second Circuit in a series of decisions, the Sixth Circuit, the Seventh Circuit, this court has gotten, has recognized the body of law but hasn't really had a chance to dive into the details. What the courts have recognized, that you have to look for a few different things in a case like this. In a case like this where there's a claim that the student was discriminated on the basis of sex in the sense of an erroneous outcome, okay, sort of a finding of guilt that was erroneous or a finding of guilt. And if so, in what proceeding? Well, so it's, I'll walk through that. So there's sort of several different times where there's a finding of, quote, guilt. So there's the initial finding that Dr. Schwake was liable or guilty of the charged offense, and then after he said, I want a hearing, people at the school, officials at the school sort of treated him as a, quote, convict. That's a quote. Well, wait a minute. I understand you're an advocate, and you're going to color it the way you want to, but the reality is that, at least my reading of the record, doesn't show a finding. There was an allegation. Your client was represented, whether it was you or some other counsel, requested a hearing. Correct. There was a hearing, or at least there was an opportunity for a hearing, and it was a settlement, right? No, that's not exactly correct. Okay, correct me. Sure. So Dr. Schwake demanded a hearing. So the way the process works at ASU is there's sort of an initial administrative finding of guilt, right? And then, if you are not satisfied with the outcome as the student, if you're not satisfied with the outcome, you can say, I would like a full-blown adversarial hearing. I want an evidentiary hearing with witnesses and documents. And the first one is an informal discussion, basically, right? Discussion that led to very serious consequences. Well, temporarily, basically what we would call a stay. They basically tried to protect the female student who'd made the allegation from potential harassment while the matter was being investigated, right? At least that was their perspective. That was their perspective. So then he asked for a hearing. So then what happened? What happened is the school never gave Dr. Schwake access to the evidence against him. The school did not speak. I'm going by the First Amendment complaint, and I was appointed for purposes of supplemental briefing and arguments. So I'm going based on the record that was developed below. But the school did not engage with Dr. Schwake's exonerating evidence. The text messages that suggested the exchange in question was consensual. He offered witnesses, and ASU did not go interview those witnesses. Well, okay. Let's say all that's true. My understanding, and I look at the same record that you do, is that Dr. Schwake was represented by counsel. There was an exchange going back and forth, and ultimately an agreement as to how this was going to be handled. As far as I know, there was no final claim that said we did anything wrong. He didn't admit doing anything wrong. Is that correct? Not exactly, Your Honor. So I think the agreement is how ASU characterizes it. And remember, we're here on a 12B6 motion, so we need to infer in my favor, in my client's favor. The agreement was forced upon Dr. Schwake. He wanted the hearing. He demanded the hearing. He said, Why didn't he tell his lawyer that he wanted the hearing? He didn't want a settlement. Because the school manipulated the process and changed a few days or a few weeks before the hearing. The school said, we are going to change your punishment to remove the suspension and expulsion so that you are no longer entitled to a hearing. And Dr. Schwake said, I want a hearing. I want to clear my name, which has been dragged through the mud. And the school said, to add, there are no rights to appeal. You cannot challenge this. But he got the right to get his degree. He got his degree. He wasn't going to have that before. He got his degree. And then in terms of publicity, he filed the lawsuit. He filed the lawsuit in his own name. And it was because of the lawsuit that a future employer was even aware of this, right? Your Honor, I don't think that we can tell citizens you have to suffer in silence and let your rights be violated. And if you complain about it in a court of law, which you're entitled to do, it's on you for damaging your reputation. I don't think that's the law, Your Honor. Counsel, I realize you were appointed after this. But the first amended complaint alleges that there was a negotiated settlement. And that is the issue. Because it sounds like, saying it was a negotiated settlement, that some rights were relinquished at that point. And that that would preclude later pursuing the lawsuit. How do you respond to that? I completely appreciate what Your Honor is saying. But I think that it's not, I don't think it's fair, especially at this stage, to actually call it a real negotiated settlement. Because if you read the complaint and the surrounding paragraphs, Dr. Schwalke said, I don't want this deal. I want the hearing. And the school said, too bad. We have changed your punishment to avoid the hearing. And there is no, Dr. Schwalke asked, this is in the first amended complaint, Dr. Schwalke said, I want to appeal this decision of not allowing me to have a hearing. And the school, I believe it's defendant Hicks, but the school said, there are no channels for that. But wait a minute. Wait a minute. Isn't it correct that until the settlement, he clearly did have a right to a hearing? Yes. Until the school changed the punishment. Well, wait a minute. As I understand, he had a right to a hearing. And then in front of the settlement, in effect, he gave up that right. He got certain things. He gave up certain things. Is that a fair statement? Your Honor, I trouble with calling it a settlement because I think of a settlement as being a mutual agreement where both sides say, I'm giving up something that I have to get something from you. Each side got something. He got a degree. He wasn't going to I don't want this degree. I want to fight this in the court. I'm just going to stand here. It's going to be the Alamo. I'm not going anywhere. I think, Your Honor, that's a really untenable position to put a young person in. To say the degree that you have worked for, for a professional lifetime or a scholastic lifetime, is in jeopardy. We are going to give you a raw deal. And if you want to keep this degree, you've got to take our raw deal. But who signed it? I don't know that there's any. So I haven't seen anything signed. And I don't think there's a reference to anything we have. Your Honor, I have not seen anything and there's nothing in the first. Is there anything in writing? Not. I haven't seen a settlement agreement. I mean, I agree with you. If we had a look in the typical civil context, if we had a settlement agreement that said we all aren't walking away, it'd be a different case. But this really, when you read the amended complaint and you read it in the light most favorable to Dr. Schwake, this is a unilateral deal. The school said, take the deal. There are no rights to appeal. And oh, by the way, if you want to file a case that's done to you, we will — we may come after you. We might even revoke your degree. So it's a really coercive situation. And I think if you look at the cases from the Second, Sixth, and the Seventh Circuit — yes, Your Honor. So what here has proved that this was all based on sex discrimination? A couple things, Your Honor. That's what I was trying to get to. So what the courts have done, what the circuit — the other circuits have done is say, look for two things. Look for an investigation gone awry. May or may not be discriminatory, but it's a reason — it's smoke, right? It's reason to look a little further, like you would in the Title VII context. You've got a — you know, there's an employee disciplinary issue, and maybe the process, like in this Court's Nicholson case, maybe the employee disciplinary process is a little suspect, not necessarily discrimination, but we need to look a little further. Then you look at the context. ASU was under tremendous political and economic pressure to come down hard on accused male students. ASU was under a federal DOE, Department of Education, investigation. Those investigations put millions of dollars on the line. But what was the nature of that investigation? It doesn't say one way or the other, was it against — were they biased against men? Were they biased against women? The complaint doesn't say it. I think so. As I understand the context, and if you think about what is likely to happen on campus, typically it is going to be men who are accused of sexually assaulting women. That's statistically almost always going to be the case. And that's not to say those are — to sort of argue about the percentage that are valid as opposed to invalid, but that's the typical fact pattern. And the Dear Colleague letter, the 2010 or 2011 Dear Colleague complaint, but no one denies what it is, that also put pressure on schools to come down hard on accused students who are almost always men. And so you have the school acknowledging to Dr. Schwake — he's a liability by being on campus. But the 2014 investigation, we don't know what that was about. I believe in the First Amendment complaint it is about sort of an inadequate response to campus sexual assault, which I would argue is almost always going to mean women who have been abused by men, and the school is not doing enough to protect them. Really valid interest. I mean, I'm here to tell you that is an extremely important interest to protect victims. But this is speculation at this point. Well, I wouldn't say it's speculation. I think that it's a fair read of the complaint in sort of the practical context that ASU — given that most allegations of sexual misconduct are going to be against men, and if ASU is being suspected by the federal government of not doing enough to protect victims, it's likely the case that ASU is not doing enough to protect female victims against — who've been — Well, let's say all that's true. Yes, Your Honor. Let's say all that's true. You still have a situation where your client has made these allegations. So far as I know, under Arizona law, there's no property interest or a liberty interest in getting his graduate degree. Do you agree with that? Well, Your Honor, frankly, I think with respect to the due process analysis, it is hard to make a clear property or liberty interest with a couple of exceptions. I do think there's a fairly clear liberty interest in protecting one's reputation in the disciplinary context. I think the name-clearing cases from this Court make that fairly clear. But in terms of the property interest, the problem — and I think the reason that this Court advises district courts to be reluctant to dismiss cases on qualified immunity grounds at the pleading stage is that you often don't really know what the contours are of the property interest or the liberty interest at stake. It may be that — The problem with the qualified immunity is that the Supreme Court has said that when a constitutional right is not clear, that you can't hold a public official to a standard that's not clear. And so we don't want them to have to go through the trial and everything else when the standard that they're going to be judged by is not clear. Absolutely, Your Honor. With respect to legal unclarity or lack of legal clarity, I'm in complete agreement. What I'm talking about is lack of factual clarity. Until you get into discovery sometimes and really understand what are the property rights at stake here — But, counsel, with respect, other lawyers like you, good lawyers, come in and they always say, well, we need to get to the jury. We need to get to the jury. We need to get to the jury. We get it in police cases. We get it in sexual harassment cases, all kinds of things. This is no different. I understand that your client is upset. Your client would like to have certain things. But he had certain procedural rights under Arizona administrative law. He, so far as I can tell, got those rights. And he settled his case. Now, he may have buyer's remorse. He may be upset about it. He may feel he was unjustly accused. But the reality is he settled it. He got his degree. He got certain rights. Then he filed a lawsuit afterwards that, at least according to my understanding of the record, is it was the very fact that he filed the lawsuit that created a problem with a future employer because they found that he himself was the tip-ee, if you will, or tip-or about what had happened. Your Honor, I actually think there was damage to Dr. Schwake's reputation before he filed the lawsuit. And that's in the First Amendment complaint. He wasn't able to access his lab. He couldn't complete his ongoing experiments. He looked like an unreliable researcher. And people started to hear because the school officials at the school, like Dr. Sear, called him a, quote, convict on campus. Yes, Your Honor. If we were to give you, or direct the district court to give you further leave to amend, what additional facts would you allege in this complaint to make out your claims? So I think on the, let me take that, let me take Title IX first in the interest of time. I think on Title IX, I actually think on Title IX we're pretty close if you look at what the other circuits have done, which is to say you've got an investigation that is, viewed in the light most favorable to us, really concerning. And you have political pressure where the school, to protect itself, could plausibly be discriminating against a relatively powerless student like Dr. Schwake. And I think that if you look at what's happened in the other circuits, that's enough. And so could I go add some more factual detail about other, you know, sort of pattern evidence? Sure, but that's hard to get without discovery. I think we've got some allegations in there, but that's hard to get until you get into documents and so on. And I'm not, I mean, to be clear, I'm not, I'm not here on summary judgment saying we win, we go to the jury. I'm here saying it's 12B6, it's a permissive standard because in anti-discrimination cases, oftentimes the discrimination is so subtle. It relies on subjective intent, on very subtle behavioral attributes. I see I'm running over time, but because it relies on those subtleties, you have to get into discovery. You have to get emails and text messages, and you have to put people under oath and ask them hard questions about why they did what they did. So I think we're there. With respect to Title IX, I think with respect to due process. Did you ask for a leap to amend? We did not. This is the first amended complaint, and we did not. Well, let me, I'd have to check the briefing. I don't think we filed a motion. There might have been something in the brief like you might see sort of a catch-all, but I don't think it was a clear request. Although I understand this Court's law to be, my home circuit is the 11th, not as permissive as you all are. I think in the 9th, I understand the law to be sort of, you know, if there's a chance, give them leap to amend, even if they don't ask for it specifically. And so I think the due process side could use some work. Your word, don't ask, don't tell. Thank you, Your Honor. All right. Thank you, counsel. Good morning. May it please the Court. My name is Michael Goodwin. I represent the Arizona Board of Regents as well as the various Arizona State University officials who are being sued in their personal capacities. And I, too, would like to start with the Title IX claim, which seems to be the focal point of today's argument. Of course, the question presented to the Court is whether the plaintiff has pleaded plausible allegations of sex discrimination. The plaintiff is relying on an erroneous outcome theory, which means that he must plead facts that cast doubt on the outcome of the proceeding and that the flaw in the proceeding was because of his gender. And we contend that he did not do that. The district court agreed. Counsel, did the Ninth Circuit adopt the erroneous outcome theory of liability? Has it ever adopted that? It has approved it. In the Austin versus University of Oregon case, it approved it. In that case, the plaintiffs had pleaded different theories under Title IX. They all come back to sex discrimination. I think the plaintiffs there were alleging deliberate indifference and selective enforcement and erroneous outcome. And it really comes back, you have to plead allegations of sex discrimination. But the Ninth Circuit did appear to recognize that as a viable theory. Can there even be an erroneous outcome if there was no, if you will, ultimate finding of anything, really? The hearing was aborted, apparently, because of a settlement. Has the condition precedent for even a finding of erroneous result in this case? Yes. Well, that's a good question. We agree there was a compromise that was arrived at, and Mr. or Dr. Schwake accepted the benefits of the bargain on that. Was that in reduced to writing, by the way? Well, it was not in the sense of a settlement agreement. That's not in the record, but I can say there was not a signed agreement, as there would be, say, to resolve a civil case. The thing that bothers me about that is that it's not in the record, and the allegations are that he wanted a hearing all along, but it was the school deciding unilaterally, no, we'll let you graduate, and then we won't give you a hearing, because if we let you graduate, we don't have to give you a hearing under our procedures, so that he unilaterally accepted. It was unilaterally imposed on him as opposed to an actual mutual agreement that this was going to be a satisfactory outcome. Well, I think it's like any agreement. You never quite get what you want. You settle a civil case, you might have wanted this and A, B, and C, and you end up settling for only A, and so you never quite get it. If it wasn't written, how do we know there's an agreement? Well, that he received the benefit of his bargain. If you were looking at this as a contract case and the situation changed because of it, that he had something he got a benefit that he didn't have before there was an agreement. Because remember, under university policy, if someone is facing a hearing, if a disciplinary hearing, in this case, a disciplinary hearing was scheduled, and under the rules, the student can't graduate. He was not going to graduate. He had completed the requirements for graduation, but he wasn't going to. And there's allegations in the complaint that he defended his dissertation while all this was going on, and he had met the requirements to graduate, and by virtue of this agreement, things changed. He was allowed to graduate and go on to other things. He graduated, but he also had his, to some degree, his lab privileges were restored, right, just at a different time than the young woman who accused him was going to be in the lab. Is that correct? Well, he was, by virtue of this agreement, what happened was he was banned from the lab for three years. That was the campus access restriction. Right. So there still was a disciplinary action imposed that limited his access to the lab. Right, but as part of the settlement, he got to graduate, but did he not also have some restoration of lab privileges? Not what he had before, but something different. Did I misunderstand that? I believe, I don't believe there's any allegations about that in the complaint. One way or another. He graduated, and he was restricted from two buildings where the labs were on campus and from working at Arizona State for three years. So what do we make of this Professor Seeger, who had no role in the process, but apparently, and this was before Schwake filed the lawsuit, and this Professor Seeger was telling other students, making it widespreadly known, according to the allegations, that Schwake was being investigated for sexual harassment on the campus. Well, there certainly are allegations about that. The way it's pleaded in the complaint is that it's the basis for a Section 1983 claim under an alleged violation of the right to informational privacy, which in our view is not a right at all. So your question, Judge Wardlaw, was what to make of it, is that there's no cognizable claim there. Based on those statements. But it is, I mean, there seems to be something wrong with the process where it should be sort of a confidential investigation. There's some rogue professor talking about the details of it to students in his class. That's not consistent with your policies, right? There are no policies that would authorize that, yes. But, again, the question is whether it violated Dr. Schwake's constitutional rights, and the answer is no to that. It also goes, I mean, I have it under that particular factor under the Title IX alleged discrimination on the basis of sex. It's one of the four factors that make up his complaint. Well, if you're considering that as part of the evidence relating to the Title IX claim, again, what we're looking for is something that casts doubt on the proceeding. This was, according to the complaint, there had already been the initial informal hearing and a determination that plaintiff uses the word that he was guilty. No, that he was found responsible. And that had happened in September of 2014. After that is when Seeger allegedly made the remarks that are alleged in the complaint. So it had no bearing whatsoever on the proceeding. The finding of responsibility had already occurred. And Dr. Seeger, as you indicated, had no role in that. So this is extraneous to the disciplinary proceeding. So if we're looking at, again, the plaintiff's theory is erroneous outcome. The focus is on the ---- are found guilty regardless of evidence. Why is that not sufficient to survive 12b-6 under Title IX? Well, that's similar to what was in Austin v. Oregon, which was dismissed by the district court and affirmed by the Ninth Circuit. It doesn't go to gender discrimination is why. Well, if all men are found guilty regardless of evidence, how is that not discrimination? It's not discrimination because it doesn't say what happened to females who are accused. Isn't it similar to Doe v. Miami where they said every male found accused of sexual misconduct in 2013 and 2014 were found responsible and that was enough to survive? Your Honor, I'm not sure about Doe v. Miami. I do know that there was one case where a plaintiff had ---- where a court determined, and it could have been the Miami case, where a court determined that there were sufficient allegations of sex discrimination based on the record, the disciplinary record of the university, where there was actual allegations in the form of an affidavit attached to the complaint that provided statistical proof, but just a broad, conclusive restatement that males are found ---- are invariably found. It doesn't say what happened to females, and that was the problem that the ---- But does the complaint have to allege all of that? I mean, you know, that sort of seems to be something that gets developed factually later. I mean, you know, we are at 12 v. 6. Another factor that I have that other circuits have recognized way in on the Title IX issue is the fact of the Department of Education investigation into Arizona State's procedures and investigation of sexual assault on campus. Well, yes, and the argument now seems to be that this somehow put pressure on the university. And this argument, let's ---- first of all, I would point out, this is a brand-new argument, never made in the district court. But it was made as an allegation in the complaint. It is, but it's a new argument. But the cases that have said that pressure on the university is relevant have said that you have to have more, that that's not enough to push a complaint over the line of plausibility. And if you look, I keep going back to the University of Oregon case because that's the one published decision of the Ninth Circuit on this, and there was much greater pressure on the university there, not a generalized pressure. Yes, theoretically, it's possible that the Department of Education can cancel the funding to states. It rarely occurs. It's a theoretical possibility. But what we're talking about, the argument they're making is this very generalized pressure. Well, what about their allegation about the 2014 investigation, that there actually are being targeted by the DOE? Isn't that the plus that you're talking about? Well, no. There must be some pressure on the university. The cases that have talked about pressure have talked about an event like that combined with particular allegations relating to the specific investigation at issue, in this case the investigation of Mr. Schwartz. So you concede it's possible that there is enough pressure, but there's just not the plus factor to get it over the 12b-6. Well, yes, but I'm saying that the pressure here, even the pressure they're talking about, is this generalized pressure. And in the University of Oregon case, there was more specific pressure on the university. There was a campus-wide protest over the alleged assault in that case, to the point where the president of the university had to go public and give a press conference about it. And the Ninth Circuit said, okay, that's not enough to create a plausible claim of sex discrimination, and it affirmed the dismissal on 12b-6. So the pressure they're talking about here is insignificant compared to what was going on in the Oregon case. From your perspective, it's just too conclusory, too generalized to meet the plausibility standard. Correct. And I say my time is getting short. I wanted to address Judge Wardlaw's question to Appellant's Counsel about whether leave to amend should be granted, and I would respectfully say no, that would not be appropriate here. The plaintiff had a chance. He stood on this complaint. He has given us his best case. When the lawsuit was first filed, the district judge issued an order saying before any 12b-6 motion can be filed, the parties have to meet and confer. And at that point, the plaintiff's counsel says, no, I'm not changing a thing. By the way, that order is Document Entry Number 4, and so we had to certify before the first motion to dismiss that we had conferred, and the plaintiff said, no, I'm not changing a thing. Then there was a motion to dismiss, and the plaintiff, in response to that, said, well, if my complaint is deficient, give me a chance to amend. That was the first time. So the district court granted leave to amend. And then on the second go-around, there was no request by the plaintiff to amend the complaint again. So the plaintiff has had multiple opportunities to complain. The plaintiff has said, this is what I'm standing on. I've given you my best case, and when you asked the question before what could be added, I didn't hear anything new about a Title IX claim. What plaintiffs seemed to be arguing was we need to do discovery, but the whole point of doing this plausibility analysis in the first place is to examine the complaint to see if it's sufficient to unlock the doors of discovery, and we would submit that this complaint here is not sufficient to do that. Therefore, we would ask that you affirm the district court's dismissal. All right. Thank you, counsel. I'll give you a couple minutes. You used up all your time, but you did come all the way from Georgia. Thank you. I'll be brief. So at the 12B6 level, very quickly, I think that the Supreme Court in the Spierkowicz case, which I may be mispronouncing, and this court in Austin and various other cases has cautioned, don't be too hard on anti-discrimination plaintiffs at the 12B6 stage because these cases are hard to plead. It is hard to discover what's really going on, and we can't shut the courthouse down just because there's not a damning admission in the record that somebody was discriminated. But with respect, you heard what your opposing counsel said. I don't know whether you agree with him, but he makes the point that your client was resistant to amending anything and nevertheless was given one opportunity to amend, and thereafter he just stood. He said, I'm not changing anything. This is my best shot. I'm not going anywhere. This is not one of those cases where you have this tenderfoot, unrepresented, that has no idea what he's doing. This is an intelligent, capable man with a doctorate who felt wronged. He stated his best case. He got one chance to amend. He didn't want to amend. Surely you're not saying to us that we're going to force him to amend, if you will, after he has taken this stand. He says this is his best shot. Do you disagree with that? I don't disagree, Your Honor, because I don't know, on the Title IX side, I don't know what more I could allege without access to their files to get pattern evidence and documents or an admission from somebody. I mean, this is all you, in reality, in real life, this is what you get. But this is the very problem, of course, with Iqbal and Twombly. Anybody that's in that situation said, look, how can I possibly be more specific? I don't have access to discovery. And the Supreme Court said, you know, you've got to allege something that's plausible. It can't be too general. You've got to be more specific. And in this case, he had an opportunity to amend. He didn't want a second opportunity to amend. I just don't see how we can say, you know, even though he didn't want to amend, he had one prior risk, one. We're going to make you go back and amend. And I think, Your Honor, the key case is actually not so much Twombly and Iqbal. It's Spierkowicz, which comes later. And Spierkowicz is right. And they say, look, civil rights. I mean, look, I get in a big antitrust case, you need a lot of detail, right? In a single plaintiff civil rights case like this, you look at what Spierkowicz had, 9-0. The justices said you detail what happened to you at your job. You detail the names and the dates. That's probably enough. It depends on the case. But, Your Honor, if I could, I wanted to point you to a couple of things in the record that I think would help. You asked, Your Honor, Judge Smith, about sort of the circumstances of this being a settlement. So on ER 26, paragraphs 93 and 94, I'm going to quote, Defendant Hicks stated that as the case did not involve a suspension, expulsion, or degree revocation, plaintiff was not entitled to a hearing and one would not be held. When plaintiff protested, Defendant Hicks said the decision was final according to the ABOR Student Code of Conduct and its legal counsel. When asked about any appeal process, Defendant Hicks stated no and that ASU had no channels to do so. That is unlike any contract I have ever seen. I don't think that it is fair on the 12B6 level to characterize that as a bona fide settlement where everybody gives up a little something but tolerates the outcome. Would you agree that if he had not taken the degree, he would have had an opportunity to appeal? I don't know if he can make them reimpose the punishment. I don't know. I don't know that the rules. I mean, before the decision was made to go forward. He could have appealed until they said we're changing your punishment, we're manipulating the process on the fly to avoid the appeal. I don't know if he can say no, no, no, punish me, punish me. I mean, it's not in the ABOR Code of Conduct. I don't think it contemplates that. It's an unusual situation. That's a discovery type thing. You put somebody under oath and ask. And, Judge Wardlaw, I know I'm over time, but I just had a couple of pin sites for you two about whether Defendant Seeger and his description of the plaintiff as a convict was in the Title IX section. So that's ER 32, paragraphs 128 and 129 specifically describe how Seeger maligned Dr. Schwake and how that contributed to the Title IX violation and, in my belief, also to the sort of ethos or atmosphere of insufficient protection for the rights of accused male students. Thank you, Your Honors. All right. Thank you, Counsel. And I want to thank Mr. Block and Alston and Bird for their pro bono representation today. Schwake v. Arizona Board of Regents will be submitted.
judges: Wardlaw, M. Smith, Bumatay